290 N.J. Super. 588 (1996)
676 A.2d 565
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
B.H., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 1995.
Decided May 15, 1996.
*591 Before Judges LONG, BROCHIN and LOFTUS.
Christine M. Cote argued the cause for appellant (Cooper, Perskie, April, Niedelman, Wagenheim & Levenson, attorneys).
James F. Smith, Assistant Prosecutor, argued the cause for respondent (Jeffrey S. Blitz, Atlantic County Prosecutor, attorney).
The opinion of the court was delivered by LONG, P.J.A.D.
On February 6, 1992, a permanent domestic violence restraining order was entered against defendant, B.H., which prohibited him from having contact with or making harassing communications to his wife, M.H., and their children and which forbade him from entering the premises on North Village Drive in Somers Point and Belhaven Avenue in Linwood. Thereafter Mrs. H. filed criminal complaints against defendant alleging contempt of the domestic violence restraining order (N.J.S.A. 2C:33-4(a)) and harassment, arising out of incidents which occurred on April 16, 1992 and on June 23 and 25, 1993.[1]
*592 A bench trial was held at which Mrs. H. testified that on April 16, 1992, at about 12:45 p.m., she was driving home when she saw defendant's car on North Village Drive; defendant slammed on his brakes; screamed at her (because her car windows were closed, she could not hear what he was saying); gestured with his fist; and then proceeded to point his finger at her in a gun-like gesture.
She further testified that on June 23, 1993 she received a letter addressed to her with defendant's return address (at the county jail) on it.[2] In the envelope she found defendant's notice of motion to decrease child support and a ripped-up copy of the June 23, 1992 support order he sought to modify. On June 25, 1993, Mrs. H. received a certified letter from defendant. In it she found another copy of the motion and a copy of the same court order, in the same condition.
The trial judge found Mrs. H. to be an "extremely credible" witness and, on the basis of her testimony, concluded that the incidents of April 16, 1992 and June 23 and June 25, 1993 occurred as she reported them. These were his only factual findings. He made no findings as to the history of the parties' relationship and did not expressly take that relationship into account in reaching his conclusions. On the evidence, he found defendant guilty of three violations of the February 6, 1992 permanent domestic violence restraining order as a result of the contacts of April 16, 1992, and the mailings of June 23 and June 25, 1993. He also found defendant guilty of two counts of harassment under N.J.S.A. 2C:33-4(a) arising out of the mailings. Defendant was found not guilty of harassment in connection with the events of April 16.
*593 The trial judge sentenced defendant to a six-month custodial term for the contempt of April 16. The judge then merged the harassment convictions into the contempt convictions arising out of the June 23 and June 25, 1993 mailings and sentenced defendant to a concurrent thirty-day custodial term on each conviction. These sentences were to run concurrent with each other and with the sentence for the incident of April 16.
Defendant appeals, contending that the following trial errors warrant reversal:
POINT I:

N.J.S.A. 2C:33-4(a) AS IT PERTAINS TO A COMMUNICATION MADE IN "ANY OTHER MANNER LIKELY TO CAUSE ANNOYANCE OR ALARM" IS UNCONSTITUTIONALLY VAGUE AS APPLIED TO DEFENDANT'S ALLEGED CONDUCT.
POINT II:
THE TRIAL JUDGE'S FINDING THAT THE COMPLAINING WITNESS' RECEIPT BY MAIL OF TWO (2) COPIES OF A COURT ORDER IN A TORN CONDITION IS HARASSMENT WITHIN THE MEANING OF N.J.S.A. 2C:33-4(a) IS UNSUPPORTED BY THE EVIDENCE.
POINT III:
THE MAILING OF THE TORN COURT ORDER WITH THE PRO SE MOTION WAS NOT AN IMPERMISSIBLE CONTACT IN VIOLATION OF THE RESTRAINING ORDER WHICH WOULD THEREBY CONSTITUTE A VIOLATION OF N.J.S.A. 2C:29-9(b).
POINT IV:
THE TRIAL JUDGE ERRED BY ADMITTING INTO EVIDENCE COPIES OF THE ORDERS IN A TORN CONDITION SINCE THE TRIAL JUDGE FOUND THAT THERE WAS "NO CHAIN OF CUSTODY" ESTABLISHED BETWEEN THE TIME THE COMPLAINING WITNESS ALLEGEDLY RECEIVED THE DOCUMENTS AND THE TIME THEY WERE INTRODUCED INTO EVIDENCE.
POINT V:
PROSECUTION OF THE CONTEMPT AND HARASSMENT CHARGES ARISING OUT OF THE APRIL 16, 1992 INCIDENT SHOULD HAVE BEEN BARRED PURSUANT TO THE FUNDAMENTAL FAIRNESS DOCTRINE.
POINT VI:
THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING DEFENDANT GUILTY OF HAVING VIOLATED THE RESTRAINING ORDER ON APRIL 16, 1992.

*594 POINT VII:

THE TRIAL COURT ABUSED ITS DISCRETION BY NOT GRANTING DEFENDANT'S MOTION FOR A NEW TRIAL OR, IN THE ALTERNATIVE, DISMISSING THE RESTRAINING ORDER VIOLATION CHARGE BECAUSE OF THE PROSECUTOR'S FAILURE TO PROVIDE SPECIFICALLY REQUESTED DISCOVERY, PRIOR TO TRIAL, OF TWO STATEMENTS BY COMPLAINANT.
We have carefully reviewed this record in light of these contentions and have concluded that the arguments raised in Points I, IV, V, VI and VII do not warrant our intervention but that the contentions raised in Points II and III are meritorious.

I
We begin with the constitutional challenge raised in Point I. Defendant claims that N.J.S.A. 2C:33-4(a) is void for vagueness as applied to his mailing of the torn-up court order. The statute provides:
2C:33-4. Harassment.
Except as provided in subsection d., a person commits a petty disorderly persons offense, if, with the purpose to harass another, he:
a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
A communication under subsection a. may be deemed to have been made either at the place where it originated or at the place where it was received.
d. A person commits a crime of the fourth degree if in committing an offense under this section, he acted, at least in part, with ill will, hatred or bias toward, and with a purpose to intimidate, an individual or group of individuals because of race, color, religion, sexual orientation or ethnicity.
Defendant argues that the language of the Section (a) which proscribes communication made in "any other manner" fails to delimit what communications are prohibited. More particularly, he claims that "[a]lthough the statute was unquestionably designed to protect persons from repetitive phone calls and abusive, physical conflicts," it cannot be construed to interdict mail contact because it does not specifically state that use of the mails constitutes *595 a communication. However, mail is a classic form of communication, and nothing in the statute suggests mail is excluded from its purview. That mail was intended to fall within the coverage of the statute is underscored by the fact that the former harassment statute, N.J.S.A. 2A:170-29, was specifically limited to verbal and telephonic communications while this version is not. Presumably, by not including the limit on communication that existed in the earlier act, the Legislature intended the term "communication" in N.J.S.A. 2C:33-4(a) to be all-encompassing.
Defendant misreads State v. Finance Am. Corp., 182 N.J. Super. 33, 440 A.2d 28 (App.Div. 1981) and Roe v. Roe, 253 N.J. Super. 418, 601 A.2d 1201 (App.Div. 1992), neither of which suggests that the statute does not include communication by mail. Clearly, defendant was on notice by the very terms of N.J.S.A. 2C:33-4(a) that mail communication is within the scope of its interdiction.[3]
As to Point IV, no viable chain of custody issue was presented because the evidence (the torn-up court order) was not fungible but was an easily identifiable item which, in fact, was identified by Mrs. H., thus laying the foundation for its admission. Washington v. Virginia, 228 Va. 535, 323 S.E.2d 577, 587 (1984).
As to Point V, no fundamental unfairness arose out of the State's refusal to drop the prosecution for the April 16 incident based on the July 8, 1992 plea bargain. By its terms, the plea bargain did not encompass the April 16 charge and there was no evidence that defendant's reasonable expectations were not fulfilled. Indeed, he does not actually claim that, at the time of the plea bargain, he believed he could not be prosecuted for the event *596 of April 16, 1992. Even if he did, the record reveals that defendant learned of the prosecution for the April 16 incident prior to his sentencing, and thus could have retracted his guilty plea which he did not attempt to do. This is powerful evidence that defendant did not expect the plea to wipe the slate clean of the April 16 incident. In sum, there was no reason for the State to refrain from prosecuting.
The dismissal of the April 16 harassment count was based on the fact that the State charged defendant under N.J.S.A. 2C:33-4(c) which requires proof of a "course of conduct." The judge held that no course of conduct was shown. This ruling did not preclude a finding that defendant violated the domestic violence restraining order, thus Point VI fails.
Finally, as to Point VII, it is clear that two documents relative to the incident of April 16, 1992 were not provided to defendant until after the trial. Although not couched in these terms, defendant is essentially arguing that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In order to establish a Brady violation, the defense must demonstrate: (1) that the prosecutor failed to disclose the evidence, (2) that the evidence was of a favorable character for the defense, and (3) that the evidence was material. State v. Landano, 271 N.J. Super. 1, 32, 637 A.2d 1270 (App.Div.), certif. denied, 137 N.J. 164, 644 A.2d 612 (1994). As the trial judge held, the prior statements by Mrs. H. "essentially mirror[ed]" her testimony at trial and could not have changed the outcome. Because the undisclosed evidence was essentially cumulative there is no probability that the verdict would have been affected. State v. Carter, 91 N.J. 86, 449 A.2d 1280 (1982).

II
We turn now to the arguments raised in Points II and III of defendant's brief which, we believe, have merit. In Point II, defendant argues that with respect to the torn-up court order there was no evidence that his conduct was likely to cause *597 annoyance and alarm, and that, in any event, a purpose to harass was not proved.[4] To address this issue, a closer look at this criminal statute is in order. Pursuant to the statute, a person is guilty of harassment, if, with the purpose to harass another, E.K. v. G.K., 241 N.J. Super. 567, 575 A.2d 883 (App.Div. 1990), he or she engages in an act prohibited by the statute. Standing alone, proof of a defendant's purpose to harass a victim is insufficient to sustain a conviction under N.J.S.A. 2C:33-4. The purpose to harass must be coupled with the performance of one of the acts proscribed by Sections (a), (b) or (c) of the statute in order to constitute harassment. Cf. Grant v. Wright, 222 N.J. Super. 191, 196, 536 A.2d 319 (App.Div.), certif. denied, 111 N.J. 562, 546 A.2d 493 (1988) (interpreting Section (c) of the act). These sections address categories of conduct which can be broadly described as communications, physical contact, and course of conduct.
Under Section (a), which is at issue here, the prohibited acts are communications likely to cause annoyance and alarm including those made anonymously, at extremely inconvenient hours, in offensively coarse language, or in any other manner; Section (b) outlaws offensive touching including striking, kicking or shoving; and Section (c) prohibits a course of alarming conduct or repeated acts done with purpose to alarm or seriously annoy another.
The trial judge found that the mailings of June 23 and June 25, 1993 were communications likely to cause annoyance or alarm within the meaning of N.J.S.A. 2C:33-4(a). Whether this finding passes muster depends on the meaning of those words. The dictionary defines "to annoy" as to bother, irritate or irk. Webster's Third New World International Dictionary (3d ed. 1981). "Alarm" on the other hand denotes a sudden fear, apprehension or disturbance caused by an awareness of danger. Webster's Third New World International Dictionary (3d ed. 1981). Thus, "annoyance" and "alarm" are quite distinct concepts in common *598 parlance, the former more innocuous than the latter. The question is whether by using the word "annoyance" in Section (a), the Legislature intended to criminalize irksome or vexing communications. We think it did not.
We reach this conclusion by employing the well-established principle of statutory construction that the meaning of a particular word in a statute may be derived from the context in which it is used. More particularly, we think the word "annoyance" cannot be determined in a vacuum but must be ascertained relative to the word "alarm" with which it is associated, Germann v. Matriss, 55 N.J. 193, 220, 260 A.2d 825 (1970), and in connection with the overall scheme of the statute. State v. Bander, 56 N.J. 196, 201-202, 265 A.2d 671 (1970). Viewed this way, the communications prohibited under Section (a) of the statute are those which are alarming or which cause annoyance of some moment, not those which are merely nettlesome. That this is so is demonstrated by the legislative examples of forbidden communications which precede the term "annoyance" in the statute. These examples, including an anonymous letter, a middle-of-the-night phone call, and the use of offensive and coarse language are not merely minor irritants but are significantly annoying acts which, depending on the circumstances, might well cause a reasonable person fear and apprehension.
The same conclusion is reached when the term "annoyance" in Section (a) is viewed against the backdrop of the statute as a whole. Like the specific examples in Section (a), Section (b) prohibits offensive touching including striking, kicking and shoving. This is conduct, which by its very nature is at least seriously annoying if not alarming. Similarly, Section (c) forbids a course of alarming conduct or repeated acts committed with purpose to alarm or seriously annoy the victim. In short, the leitmotif which runs throughout the sections is a prohibition against conduct of some consequence. By interpreting the word "annoyance" in Section (a) in light of this clearly expressed theme, we avoid giving a breadth to that term which logic and reason and the overall *599 subject matter of the statute do not show was clearly intended. Thus we hold that only communications likely to cause alarm or serious annoyance are the focus of N.J.S.A. 2C:33-4(a).
Applying these principles, the letters of June 23 and June 25, which actually constituted a single communication served in two different ways (ordinary and certified mail), fell short of the statutory standard. The fair import of the torn-up support order was that it would not be worth the paper it was written on when defendant's motion was decided. While this was an over-the-top, in-your-face gesture, it was neither likely to alarm nor seriously annoy a reasonable person. Indeed Mrs. H.'s testimony did not suggest that it alarmed or annoyed her at all. On the contrary, it was a relatively minor irritant attached to a legitimate legal communication. Human nature being what it is, this is unfortunately the kind of infantile tweaking we have come to expect of litigants whose hopes and dreams for their marriage and family life have been dashed. To be sure, all would benefit from raising the level of discourse in this area. However, this can only be achieved through the will of the litigants and not through the criminalization of inconsequential acts the Legislature never intended to prohibit.
Had defendant sent Mrs. H. a picture of Nicole Brown Simpson or a mutilated photograph of herself, the result might well have been different. These acts would alarm or at least seriously annoy a reasonable person. The torn-up support order simply does not rise to that level.
We thus reverse defendant's harassment convictions arising out of the mailings of June 23 and June 25, 1993. This ruling makes it unnecessary for us to grapple with the equally problematic question of whether the State proved that defendant intended to harass the victim by those communications. Even if he did, it would be of no consequence to the outcome due to our holding that the letters were not likely to cause annoyance or alarm to a reasonable person.
*600 We turn next to defendant's claim that the letters of June 23 and June 25 were not impermissible contact under the domestic violence restraining order and that his convictions for contempt stemming from those incidents should be reversed. The order of February 6 stated that "defendant is prohibited from having contact with" Mrs. H. and the children. N.J.S.A. 2C:25-29(b)(6) was cited as the basis of the prohibition. The order also prohibited defendant from making "harassing communications" to the victim, the children and the victim's mother. N.J.S.A. 2C:25-29(b)(7) was cited in the complaint and judgment as the basis of this prohibition. The judge found that
[s]ome communications are permissible. A notice of motion is permissible, even though it causes annoyance or alarm. It might even be motivated by an attempt to cause annoyance or alarm, but I think it would be immune from prosecution, but the utilization of a ripped up order clearly indicates to me that this was a communication likely to cause annoyance or alarm and intended to cause annoyance or alarm. I am satisfied that it also ... constitutes a violation of the order by merely making contact....
We disagree with this analysis.
N.J.S.A. 2C:25-29(b) provides:
In proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse. At the hearing the judge ... may issue an order granting any or all of the following relief:
........
(6) An order restraining the defendant from entering the residence, property, school, or place of employment of the victim or of other family or household members of the victim and requiring the defendant to stay away from any specified place that is named in the order and is frequented regularly by the victim or other family or household members.
This section only prohibits a defendant from physically entering certain locations, thus it does not prevent him from sending mail. Accordingly, it cannot be the basis of a domestic violence contempt order involving mail.
N.J.S.A. 2C:25-29(b)(7) provides:
An order restraining the defendant from making contact with the plaintiff or others, including an order forbidding the defendant from personally or through an agent initiating any communication likely to cause annoyance or alarm including, but not limited to, personal, written, or telephone contact with the victim or other *601 family members, or their employers, employees, or fellow workers, or others with whom communication would be likely to cause annoyance or alarm to the victim.
On its face this section would support a judicial order prohibiting all contact between a defendant and a victim. However, this was not the version of the statute in effect when the domestic violence order in this case was issued. That version provided that the judge could impose:
(7) An order restraining the defendant from making any communication likely to cause annoyance or alarm including, but not limited to, personal, written, or telephone contact with the victim or other family members, or their employers, employees, or fellow workers, or others with whom communication would be likely to cause annoyance or alarm to the victim. (emphasis added).
This is the same standard as is contained in the harassment statute. Because we have concluded that the communications of June 23 and June 25 were not likely to cause annoyance or alarm under N.J.S.A. 2C:33-4(a) it follows that defendant could not have violated the terms of the restraining order by those mailings. Accordingly, the contempt convictions based on the June 23 and June 25, 1993 communications must be reversed.
We turn finally to defendants challenge to the contempt conviction arising out of the incident of April 16, 1992. Contrary to his argument, it was not his fortuitous passing of Mrs. Hoffman on the road which was the basis of the conviction, but the gun-like gesture he directed toward her. That gesture was clearly a prohibited communication under the order and was likely to cause annoyance and alarm within the meaning of the version of N.J.S.A. 2C:25-29(b)(7) in effect at the time of the incident. The fact that the judge dismissed the harassment count based on this incident because it failed to meet the course of conduct standard in N.J.S.A. 2C:33-4(c), under which defendant was charged, is not inconsistent with this contempt conviction which we affirm.
Our dissenting colleague's eloquent opinion has prompted us to add these observations. No fair reading of our decision would suggest that it is a repudiation of the trial judge's fact-finding. Indeed, we have fully accepted his findings as to what transpired on April 16, June 23 and June 25 based upon his credibility *602 assessment of Mrs. H. Where we part company from him is in connection with his legal conclusion that defendant's communications were "likely to cause annoyance and alarm." Our ruling is a matter of law on two specific points. First, we construe "annoyance" as used in N.J.S.A. 2C:33-4(a) to mean conduct which is significantly annoying and not merely irritating or vexing. Second, we hold that the phrase "likely to cause annoyance ..." in N.J.S.A. 2C:25-29(b)(7) as that statute existed during the period pertinent to this case incorporates the same standard as the harassment statute. The dissenting opinion does not deal with these holdings.
Buttressed by citations to numerous law review articles, the dissenting opinion condemns sexual harassment. We join in that condemnation. But our agreement on that point has not led us to accept our colleague's proposed disposition of this case for the legal reasons to which we have adverted. We note further that there are no findings by the trial judge to establish the factual context on which the dissent supports the conclusion that the torn up orders were more than trivially vexing. Whatever legal or sociological literature may say about patterns of conduct in cases of spousal abuse, the disposition of a specific case must rest on its adjudicated facts.
Finally, we are troubled by our dissenting colleague's conclusion that our opinion trivializes the plight of domestic violence victims. On the contrary, the problem of trivialization, which we first identified in Corrente v. Corrente, 281 N.J. Super. 243, 657 A.2d 440 (App.Div. 1995), is much more likely to flow from equating minutiae with matters of consequence than from thoughtfully distinguishing between the two.
Affirmed in part; reversed in part.
LOFTUS, J.S.C., (temporarily assigned), concurring and dissenting.
I dissent from the majority opinion with regard to Points II and III raised by defendant, B.H. (B.) for the following reasons: (1) *603 the applicable standard of appellate review mandates affirmance of the judgment of conviction of the trial court; (2) B.H.'s conduct violated the statutory provisions of N.J.S.A. 2C:33-4(a) and N.J.S.A. 2C:25-9(b); and (3) the majority opinion trivializes the plight of the domestic violence victim.

I. Factual and Procedural History
At the time of the bench trial, M.H. (M.H.) and B.H. were estranged spouses who had been experiencing an emotionally turbulent and violent relationship for some time. On September 24, 1991, the court issued a temporary restraining order as a result of an incident during which B.H. assaulted M.H.M.H. subsequently withdrew that charge on November 19, 1991. On November 24, 1991, B.H. was arrested and charged with assaulting M.H.M.H. subsequently withdrew the charge on December 19, 1991. On January 31, 1992, another temporary restraining order was issued as a result of acts of domestic violence. This temporary restraining order was made final on February 6, 1992.
The final restraining order prohibited B.H. from future acts of domestic violence, under N.J.S.A. 2C:25-29(b)(1); prohibited B.H. from having contact with M.H., her three children from a former marriage and M.H.'s mother, under N.J.S.A. 2C:25-29(b)(6); barred B.H. from North Village Drive, Somers Point, New Jersey and Belhaven Avenue, Linwood, New Jersey, under N.J.S.A. 2C:25-29(b)(6); prohibited B.H. from making harassing communications to M.H., her three children from a former marriage and M.H.'s mother, under N.J.S.A. 2C:25-29(b)(7). M.H. was granted exclusive possession of Belhaven Avenue, Linwood, New Jersey, under N.J.S.A. 2C:25-29(b)(7). M.H. was also granted temporary custody of Brandice and Margaret H., the parties' two children, and B.H. was prohibited from visiting the children pending completion of a risk assessment to be followed by a plenary hearing as to visitation under N.J.S.A. 2C:25-29(b)(3), (b)(3)(a) and (b)(11). B.H. was permitted to return to the marital residence on February 7, 1992 between the hours of 9:00 a.m. and 11:30 a.m. accompanied by law enforcement officers to remove his personal *604 belongings. The order also directed B.H. to pay support under N.J.S.A. 2C:25-29(b)(4). In February 1992, M.H. instituted an action for divorce.
When B.H., accompanied by police officers, went to the marital residence to remove his personal belongings in accordance with the February 6, 1992 order, he went into the bedroom, took scissors and cut most of her clothing which was hanging in the closet in half while the officers were in the other room.
On April 16, 1992, while M.H. was returning home after picking up a support check from her attorney's office, B.H. passed her approximately eight houses away from her home. According to M.H., he slammed his brakes on, appeared to shout something, shook his hand in a first form and pointed his index finger at her to imitate a gun.
On April 17, 1992, at 1:20 a.m., B.H. was arrested in the Somers Point home and subsequently charged with burglary, attempted larceny, criminal mischief, unlawful possession of a weapon, and contempt of the final restraining order. On July 8, 1992, B.H. pled guilty to criminal trespass and to violation of the restraining order. The remaining charges were dismissed by the Atlantic County Prosecutor's office. B.H. was sentenced on August 14, 1992, to 364 days in jail and three years probation.
On July 9, 1992, the day after B.H. pled guilty to the April 17, 1992, charges, upon the advice of the prosecutor, M.H. filed charges against B.H. for the April 16, 1992, car incident. M.H. testified that in her voluntary statement concerning the burglary incident on April 17, 1992, she also advised the police officer of the "car incident" of April 16, 1992. However, the incident was not detailed in the April 17, 1992, police report beyond the brief indication that "[B.H.] passed [her.]"
On June 23, 1993, M.H. received an envelope in the mail with her address handwritten and the return address bearing B.H.'s name and jail address. The envelope contained a motion to reduce B.H.'s child support obligation, a financial statement and a *605 June 23, 1992, order torn into pieces. The following day, M.H. received a postcard in her mailbox indicating there was a certified letter for her at the post office. She picked up the envelope on June 25, 1993. It contained the same contents as the previous envelope, with the exception that the "court order seemed to be torn-up more." Pursuant to previous instructions, M.H. notified the Atlantic County Prosecutor's office. The bench trial ensued.
With regard to the contempt charge of February 6, 1992, the trial judge found that the State had not met its burden of proof and dismissed the complaint (FO-01-162-92B).
With respect to the April 16, 1992, charges (FO-01-308-93B) involving the "car incident," the judge found B.H. guilty as to count one charging him with violating the final domestic violence restraining order contrary to N.J.S.A. 2C:29-9(b). The judge granted a directed verdict for B.H., as to the second count charging harassment under N.J.S.A. 2C:33-4(c) because the incident was only one incident and thus did not constitute a "course" of alarming conduct.
The judge found B.H. guilty of the remaining four counts arising from the mailings of the torn-up orders, two counts of contempt for violating the final restraining order contrary to N.J.S.A. 2C:29-9(b) and two counts of harassment contrary to N.J.S.A. 2C:33-4(a) (FO-01-15-94B and 16-14B).

II. Standard of Appellate Review
The applicable standard governing appellate review in a case of this nature is that the fact-finding of a trial judge may not be disturbed if supported by adequate, substantial and credible evidence. Roe v. Roe, 253 N.J. Super. 418, 432, 601 A.2d 1201 (App.Div. 1992); Rova Farms Resort v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974); State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964). This court is obliged to accord special deference to findings "which were substantially influenced by the judge's opportunity to hear and see the witnesses and to have the `feel' of the case, which an appellate court does not *606 enjoy." D.C. v. F.R., 286 N.J. Super. 589, 601, 670 A.2d 51 (App.Div. 1996). The task of an appellate court is not to reweigh the evidence but to determine if sufficient evidence exists. Roe v. Roe, supra, 253 N.J. Super. at 431, 601 A.2d 1201.
The trial judge made the following findings of fact and conclusions of law:
I have for decision five counts, one of which deals with an [incident] of April 16th, 1992. In order to determine the verdict with respect to that charge, I'm really required to weigh the credibility of the complaining witness. I'm satisfied that that witness's credibility is unimpeachable. I am satisfied that the testimony that I received from Ms. H. accurately reflects what occurred on April 16th, 1992 [the car incident]. I make that finding for two bases. The first is the manner in which her testimony was delivered to me. I saw Ms. H. on the witness stand. I was able to evaluate her body language, the manner in which she reacted to questions, and the manner in which she related answers. The manner in which her testimony was delivered was to me such as to invest it with a credibility and a worthiness of belief. I am satisfied that Ms. H. accurately reflected what occurred on the 16th. Moreover, it has an internal consistency. It deals almost entirely and logically with the manner in which she had related prior occurrences between herself and Mr. H. I am absolutely satisfied that on April 16th Ms. H. and Mr. H. passed each other in a car. I am satisfied there was a short period of time when Ms. H. was able to see Mr. H. on North Village Drive. I find that Mr. H. pointed his finger at her and shook his fist. That is a contact. It is a contact which was prohibited by the restraining order which I find was obtained by Ms. H. and which was delivered to Mr. H. and which prohibited contact. I reject any contention that I should disbelieve Ms. H. because of inconsistencies with respect to that testimony. In the real world, .. . details sometimes escape people, but the incident which was described is clearly related by Ms. H., and I'm satisfied that it did, in fact, occur. I'll enter a finding of guilty with respect to that charge, the first count of FO-01-308-93B. With respect to the charges alleged in FO-01-15-94 and 16-94, I am also satisfied that Ms. H. received a notice of motion for a reduction in child support. I am satisfied that that notice of motion was accompanied by a ripped up order. In taking that testimony, again, for the reasons which I have just laid out, [I] accept the testimony of Ms. H., ... I accept completely the testimony of Ms. H. that she received the envelope, opened it, and found a ripped up letter.... I acknowledge in evaluating Ms. H.'s testimony that she is biased against Mr. H. I accept that. But the behavior which she exhibited was also consistent with a person who is truthfully telling what happened while she's in fear of the defendant. As to whether the document was intended to cause annoyance or alarm, I can think of no other motivation for ripping up a court order and enclosing it in a communication to an adverse party. It can only be intended to annoy or alarm. As to whether it is likely to cause annoyance or alarm, I'm satisfied from the testimony here that Mr. H. had been incarcerated as a result of incidents which had occurred in which Ms. H. was the victim. It seems to me that a communication from him in any event would be likely to cause annoyance or alarm. Some *607 communications are permissible. A notice of motion is permissible, even though it causes annoyance or alarm. It might even be motivated by an attempt to cause annoyance or alarm, but I think it would be immune from prosecution, but the utilization of a ripped up order clearly indicates to me that this was a communication likely to cause annoyance or alarm and intended to cause annoyance or alarm. I am satisfied that it also constitutes a violation of the order by merely making contact, .... (emphasis added).
The trial judge had familiarity with this case. He found M.H.'s credibility to be "unimpeachable;" that her testimony was invested with "credibility and a worthiness of belief;" and that she was a person who was "truthfully telling what happened while she [was] in fear of [B.H.]" He based these evaluations upon her body language, the manner in which she reacted to questions and the manner in which she related answers. These findings with regard to credibility are to be given great deference by an appellate court. State v. Avena, 281 N.J. Super. 327, 340, 657 A.2d 883 (App.Div. 1995). The judge's findings on credibility are significant in light of current scholarly articles which indicate that, because of custom and law, women, particularly in abusive relationships, are often disbelieved because they are women and perceived as less credible than men. Judith Resnik, Gender Bias: From Classes to Courts, 45 Stan. L.Rev. 2195, 2205 (1993); Lynn Hecht Schafran, Credibility in the Courts: Why is There A Gender Gap? The Judges Journal 5, 9 (Winter 1995) (citing Ellison v. Brady, 924 F.2d 872, 879 (9th Cir.1991)); The First Year Report of the New Jersey Supreme Court Task Force on Women in the Courts  June 1984, 9 Women's Rts. L. Rep. 129, 138 (1986).
The specific facts in this case indicate a pattern of an abusive relationship. The two incidents of filing complaints and then withdrawing them are illustrative of behavior of women in abusive relationships. See Report of the Missouri Task Force on Gender and Justice, at 29-30 (March 1993); Roe v. Roe, supra, 253 N.J. Super. at 423, 601 A.2d 1201. B.H.'s acts of cutting up M.H.'s clothes while two police officers waited in the next room indicate his propensity for violent behavior. The act of driving his car into the vicinity of her home and then pointing his finger at her in a *608 gun-like manner was "contact" with the victim contrary to the restraining order which threatened her safety. The mailing of torn-up court orders on two occasions were "communications" to M.H. which were sent with intent to harass and to annoy or alarm her. They were violative of the final restraining order prohibiting him from making "contact" with M.H. or making "harassing communications" to M.H. As such, they constituted harassment under N.J.S.A. 2C:33-4(a) and contact in violation of N.J.S.A. 2C:29-9(b).
The findings of fact and conclusions of the trial judge are supported by adequate, substantial, credible evidence in the record. State v. Johnson, supra, 42 N.J. at 161-62, 199 A.2d 809. I would affirm.

III. Statutory Interpretation
In this case B.H. was found guilty of two counts of contempt for violating the final restraining order contrary to N.J.S.A. 2C:29-9(b) and two counts of harassment contrary to N.J.S.A. 2C:33-4(a) with regard to the torn-up court orders.
N.J.S.A. 2C:29-9(b) provides:
b. Except as provided below, a person is guilty of a crime of the fourth degree if that person purposely or knowingly violates any provision in an order entered under the provisions of the "Prevention of Domestic Violence Act of 1990," P.L. [1991], c.[261] (C.2C:25-17 et al.) when the conduct which constitutes the violation could also constitute a crime or a disorderly persons offense. In all other cases a person is guilty of a disorderly persons offense if that person knowingly violates an order entered under the provisions of this act. Orders entered pursuant to paragraphs (3), (4), (5), (8) and (9) of subsection b. of section 13 of P.L. 1991, c. 261 (C.2C:25-29) shall be excluded from the provisions of this subsection.
N.J.S.A. 2C:33-4(a) provides:
Except as provided in subsection d., a person commits a petty disorderly persons offense if, with purpose to harass another, he:

a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm; (Emphasis added).
The majority opinion finds that the evidence in this case did not support a finding of violation of the final restraining order under N.J.S.A. 25-29(b)(7) and harassment under N.J.S.A. 2C:33-4(a) *609 because the mailing of the two torn court orders was not a communication likely to cause annoyance or alarm and because it was not "serious" annoyance or alarm. This interpretation is contrary to the plain meaning of the statutes and to the Legislative intent.
A word or phrase should be accorded its normal and accepted connotation as well as its ordinary and well understood meaning. Fahey v. Jersey City, 52 N.J. 103, 107, 244 A.2d 97 (1968); State by Richman v. Sperry & Hutchinson Co., 23 N.J. 38, 127 A.2d 169 (1956); Jamouneau v. Harner, 16 N.J. 500, 109 A.2d 640 (1954), cert. denied, 349 U.S. 904, 75 S.Ct. 580, 99 L.Ed. 1241 (1955). "Annoy" means to "disturb or irritate, especially by continued or repeated acts; to weary or trouble; to irk; to offend." Black's Law Dictionary 89 (6th ed. 1990). "Alarm" means, to "strike with fear; fill with anxiety as to threatening danger or harm." Webster's Third New International Dictionary 49 (1993).
In subsection (c) of N.J.S.A. 2C:33-4, the legislature specifically modified the verb "annoy" with the adverb "seriously." It did not do so in subsection (a). The wisdom, good sense, policy and prudence of a statute are matters within the province of the Legislature and not of the Court. White v. Township of North Bergen, 77 N.J. 538, 391 A.2d 911 (1978).
Through the use of the ordinary and well understood meanings of the words "annoy" and "alarm" in subsection (a), and in considering B.H.'s conduct in the context of this case, the record supports the requisite finding of a "purpose to harass" to sustain the conviction under N.J.S.A. 2C:33-4(a). As to whether the trial court's inference that B.H. made those communications with an intent to harass M.H., E.K. v. G.K., 241 N.J. Super. 567, 575 A.2d 883 (App.Div. 1990), common sense and common experiences must guide. State v. Richards, 155 N.J. Super. 106, 118, 382 A.2d 407 (App.Div.), cert. denied, 77 N.J. 478, 391 A.2d 493 (1978). An inference may be deduced from proven facts. State v. Corby, 28 N.J. 106, 114, 145 A.2d 289 (1958); State v. Avena, supra, 281 N.J. Super. at 340, 657 A.2d 883.
*610 M.H. was a woman who had custody of five children, two of whom were by B.H. and three from a former marriage; whose husband had been barred from coming near her house and had been denied visitation to his children; whose clothes had been cut up by him while police officers were in the other room; whose husband had pointed his finger at her in a gun-like manner; and whose husband had criminally trespassed on her property. Her husband was in jail. For what other reason except to annoy or alarm her did B.H. send the two torn-up court orders to M.H.?
Under the factual circumstances of this case with the prior pattern of an abusive relationship, violent acts and criminal conduct, there could be no other reason for B.H. to mail two torn-up court orders from jail but to alarm and annoy M.H., and through such acts to indicate that her economic support would be cut off and that she will not receive the protection of the courts. "Just as a pattern of domestic violence is one means of exercising control and domination over a household partner, so is stalking, harassing or threatening an ex-spouse." State v. Zurmiller, 544 N.W.2d 139, 142 (N.D. 1996) (Levine, J., concurring).
Harassment under N.J.S.A. 2C:33-4(a) is a petty disorderly persons offense, which does not require "serious" annoyance as required by N.J.S.A. 2C:33-4(c). Harassment is not a third, second or first degree crime subject to the lengthy mandatory terms of imprisonment under N.J.S.A. 2C:43-6 and N.J.S.A. 2C:44-1. However, it is prohibited criminal conduct. Matrimonial litigants are not exempt from the responsibility of conducting themselves in an appropriate manner nor are they exempt from the statutory sanctions for violation of the criminal laws.
A court order represents the power and authority of the judicial branch of government. It makes no difference whether such order is for child support or a restraining order. In a matrimonial case it represents society's method of resolving conflicts in difficult emotionally charged situations between two estranged persons. The court orders in this case which were torn-up were court orders setting forth financial terms of support for the parties' *611 children. To tear them up was not only an act of defiance of judicial authority but for B.H. to mail the torn-up court orders to M.H. under these circumstances could have been for no other purpose than to annoy or alarm her with the intent to harass.
The present case is distinguishable from two previous decisions of this court on the subject of harassment. In Peranio v. Peranio, 280 N.J. Super. 47, 654 A.2d 495 (App.Div. 1995), and Corrente v. Corrente, 281 N.J. Super. 243, 657 A.2d 440 (App.Div. 1995), this court reversed two restraining orders issued because of alleged harassment under N.J.S.A. 2C:33-4(c). In Corrente v. Corrente, supra, where there was no history of assaultive behavior, this court found that there was not a violation of N.J.S.A. 2C:33-4(c) because the phone calls and the act of turning off the phone were not made with a purpose to harass and did not constitute a course of alarming conduct. Corrente v. Corrente, supra, 281 N.J. Super. at 243, 657 A.2d 440. In Peranio v. Peranio, supra, where there was no history of assaultive behavior and where there was no finding of "purpose to harass," the acts of the husband in utilizing foul language and saying "I'll bury you" after he forced entry into plaintiff's home was not harassment under N.J.S.A. 2C:33-4(c). Peranio v. Peranio, supra, 280 N.J. Super. at 55, 654 A.2d 495. In those cases, which fell under Section c, not Section a, of N.J.S.A. 2C:33-4, there were no prior incidents of domestic violence and no findings of a "purpose to harass." They were individual isolated incidents.[1]
In another case in Massachusetts, the Appeals Court affirmed a finding of violation of a restraining order barring "contact" where *612 the defendant anonymously sent flowers to his former girlfriend. Commonwealth v. Butler, 40 Mass. App. Ct. 906, 661 N.E.2d 666 (1996).
I conclude that B.H.'s acts of sending two torn-up court orders from jail to M.H. violated the permanent restraining order under N.J.S.A. 2C:29-9(b) and constituted harassment under N.J.S.A. 2C:33-4(a) because they were contacts and communications made with a purpose to harass which were likely to cause annoyance or alarm to M.H.

IV. Plight of Domestic Violence Victim
The majority in this case states that the acts of mailing the torn-up court orders are inconsequential acts, minor irritants and infantile tweakings engaged in by matrimonial litigants. These characterizations trivialize the plight of the domestic violence victim and indicate a cavalier treatment of criminal acts. Lynn Hecht Schafran, There's No Accounting for Judges, 58 Alb. L.Rev. 1063, 1065, 1067 (1995); James Martin Truss, The Subjection of Women ... Still: Unfulfilled Promises of Protection for Women Victims of Domestic Violence, 26 St. Mary's L.J. 1149, 1201-02 (1995); Lynn Hecht Schafran, Gender Bias in Family Courts, Why Prejudice Permeates the Process, 17 Sum. Fam. Advoc. 22, 127 (1994); Judith Resnik, Revising the Canon: Feminist Help in Teaching Procedure, 61 U. Cin. L.Rev. 1181, 1189 n. 38, 1194 n. 66 (1993); Note, Home Sweet Home?: New Jersey's Prevention of Domestic Violence Act of 1991, 17 Seton Hall Legis. J. 234, 256 n. 147 (1993); Note, New State and Federal Responses to Domestic Violence, 106 Harv. L.Rev. 1528, 1536 (1993); Mac D. Hunter, J.S.C., Homosexuals as a New Class of Domestic Violence Subjects under the New Jersey Prevention of Domestic Violence Act of 1991, 31 U. Louisville J. Fam. L. 557, 559 n. 11 (1992/1993); Joan Zorza, The Criminal Law of Misdemeanor Domestic Violence 1970-1990, 83 J.Crim. L. & Criminology 46, 72 (1992); Mary E. Asmus, Ellen L. Pence and Tineke Ritmeester, Prosecuting Domestic Abuse Cases in Duluth: Developing Effective Prosecution Strategies from Understanding the Dynamics of Abusive *613 Relationships, 15 Hamline L.Rev. 115, 121 (1991); Paul D. Tripodi, Achieving Equal Justice for Women in the Courts, 1 U.C.L.A. Women's L.J. 209 (1991); Natalie Loder Clark, Crime Begins at Home: Let's Stop Punishing Victims and Perpetuating Violence, 28 Wm. & Mary L.Rev. 263, 288-89 (1987).
Domestic violence is a term of art which describes a pattern of abusive and controlling behavior which causes injury to the victim. Peranio v. Peranio, supra, 280 N.J. Super. at 52, 654 A.2d 495; see, e.g., Marsha J. Kleinman, Family Violence: It can be a killer, 41 N.J. Psychologist (1991); Courtney N. Esposito, Abuse: Breaking the Cycle of Violence: The Victim's Perspective, 8 Trends in Health Care, Law and Ethics (Spring 1993), reprinted in Domestic Violence (New Jersey Institute of Continuing Legal Education 1993).
The Prevention of Domestic Violence Act (repealed, L. 1991, c. 261 § 20, reenacted L. 1991, c. 261 § 1), N.J.S.A. 2C:25-17 to -33, mandates that acts alleged by a plaintiff to constitute domestic violence must be evaluated in light of the prior history of domestic violence between the parties including previous threats, harassment and physical abuse in addition to whether immediate danger to the person or property is present. Peranio v. Peranio, supra, 280 N.J. Super. at 54, 654 A.2d 495; N.J.S.A. 2C:25-29a(1) and (2). This requirement contemplates the pattern of abuse of domestic violence from which the Legislature sought to protect the battered victims  thereby acknowledging that domestic violence is more than an isolated deviant act.
A "battered woman" is defined as:
a woman who is repeatedly subjected to any forceful physical or psychological behavior by a man in order to coerce her to do something he wants her to do without any concern for her rights.... [I]n order to be classified as a battered woman, the couple must go through the battering cycle at least twice.
[Leonore E. Walker, The Battered Woman, xv (1979).]
The three distinct phases of the battering cycle are the tension building phase, characterized by minor battering incidents; the explosion or acute battering incident, characterized by out of control rage on the part of the batterer; and the calm, loving *614 respite phase, characterized by loving and kind behavior on the part of the batterer. Id. at 55-67, 654 A.2d 495; State v. Kelly, 97 N.J. 178, 193, 478 A.2d 364 (1984). In the battered women's syndrome, minor battering incidents may trigger or escalate violent conduct. Ibid. Thus, because of the potentiality of emotionally explosive situations courts prohibit parties from contact and communication with each other.
The Legislative, Executive and Judicial branches of government in the State of New Jersey have taken a strong position with regard to domestic violence.
When the Legislature enacted the Prevention of Domestic Violence Law, N.J.S.A. 2C:25-17 to -33 it declared its purpose to be as follows:
[t]he legislature finds and declares that domestic violence is a serious crime against society; that there are thousands of persons in this State who are regularly beaten, tortured and in some cases even killed by their spouses or cohabitants; that a significant number of women who are assaulted are pregnant; that victims of domestic violence come from all social and economic backgrounds and ethnic groups; that there is a positive correlation between spousal abuse and child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence. It is therefore, the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.
[Ibid.]
At the signing of amendments to the Prevention of Domestic Violence Law on August 12, 1994, Governor Christine Whitman said:
I'm here to encourage the victims to seek the protection of the law; to say to them that from now on, you are going to receive that protection.... We are now sending a very clear signal that we expect action and that there are certain activities that are not going to be tolerated, whether they take place behind closed doors, between people who know are another or among strangers on the street.
[excerpts in Ivette Mendez, Shielding the Victim  Whitman Enacts Broader Tougher Domestic Abuse Laws, The Star Ledger, August 12, 1994, at 1, 13.]
The New Jersey Court System led the nation in investigating the extent to which gender bias existed in the court system and in developing educational programs to eliminate it. The Domestic Violence Subcommittee of the New Jersey Supreme Court Task *615 Force on Women in the Courts initially commented on the trivialization of the plight of the domestic violence victim. New Jersey Supreme Court Task Force Report, supra, 9 Women's Rts. L. Rpt. at 150.
The Judicial Council of California stated:
Again and again, this committee heard testimony that police officers, district and city attorneys, court personnel, mediators, and judges  the justice system  treated the victims of domestic violence as though their complaints were trivial, exaggerated, or somehow their own fault.
[Judicial Council of California, Achieving Equal Justice for Women and Men in the Courts, the Draft Report of the Judicial Council Advisory Committee on Gender Bias in the Courts, § 6, at 4-5 (1990).]
Other reports have addressed this issue. District of Columbia Courts, Final Report of the Task Force on Racial and Ethnic Bias and Task Force on Gender Bias in the Courts, 123-24 n. 199 (1992); Gender and Justice in the Courts: A Report to the Supreme Court of Georgia by the Commission on Gender Bias in the Judicial System, 20-21 (1991); Kentucky Task Force on Gender Fairness in the Courts, 29-31 (1992); Report of the Special Joint Committee on Gender Bias in the Courts, 2-5 (1989); Minnesota Supreme Court Task Force For Gender Fairness in the Courts, Final Report, reprinted in 15, Wm. Mitchell L.Rev. 825, 875-77 (1989); Report of the Special Joint Committee on Gender Bias in the Courts, 2-5 (Md. 1989); Minnesota Supreme Court Task Force for Gender Fairness in the Courts, reprinted in 15, Wm. Mitchell L.Rev., 825, 875-77 (1989).
A case of this nature with a prior pattern of domestic violence warrants serious reasoned judgment in light of the prior history and specific acts involved. To characterize B.H.'s conduct of mailing two torn-up support court orders under these circumstances as minor irritants, inconsequential acts or infantile tweakings is to trivialize M.H.'s plight.
For the reasons expressed, I respectfully dissent in part from the majority opinion. With regard to defendant, B.H.'s Points II and III, I would affirm the judgment of conviction for the reasons *616 set forth by Judge George L. Seltzer in his oral opinion of August 19, 1993.
NOTES
[1] Mrs. H. also filed a complaint alleging that defendant violated the order on February 6, 1992 based on information she received from a neighbor. This complaint was resolved in defendant's favor and is not an issue on this appeal. It is of note that Mrs. H. did not file a complaint or tell the police of her allegation that defendant, accompanied by two police officers, went to her home to retrieve his possessions and cut up all her clothing.
[2] On April 17, 1992, defendant was arrested in the Somers Point home and charged with burglary, attempted larceny, unlawful possession of a weapon, and contempt. On July 8, 1992, defendant pled guilty to criminal trespass and contempt.
[3] Defendant claims by way of a single sentence that his actions "can be viewed as nothing but an indication of his disagreement with that order and, the voicing of that disagreement, the First Amendment would surely protect." Because defendant has failed to brief this issue beyond this conclusory statement, we do not consider it. Miller v. Reis, 189 N.J. Super. 437, 441, 460 A.2d 210 (App.Div. 1983).
[4] Defendant also reiterates the argument that mailing correspondence is not covered by the statute. We rejected this claim in Point I above.
[1] The recent case of State v. Ettman, No. A-1833-94 (App.Div. August 21, 1995), is worth noting but is not cited as authority. See R. 1:36-3; see also Falcon v. American Cyanamid, 221 N.J. Super. 252, 261, 534 A.2d 403 (App.Div. 1987). In that case, the husband sent two support checks with the initials "O.J." written on them. This court affirmed the trial judge's finding that the insertion of the initials "O.J." on both support checks constituted a "communication" likely to cause annoyance or alarm and was done with the purpose to harass. Thus, the court affirmed the convictions for violation of a final restraining order contrary to N.J.S.A. 2C:29-9(b) and harassment contrary to N.J.S.A. 2C:33-4(a).