221 N.J. Super. 252 (1987)
534 A.2d 403
CYRUS E. FALCON, PETITIONER-RESPONDENT,
v.
AMERICAN CYANAMID, RESPONDENT-RESPONDENT, AND RESEARCH COTTRELL, INC., RESPONDENT-APPELLANT, AND RESEARCH COTTRELL, INC., RESPONDENT-RESPONDENT, AND AIM CORPORATION, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 14, 1987.
Decided March 26, 1987.
*253 Before Judges KING, DEIGHAN and HAVEY.
Hugh J. O'Gorman argued the cause for appellant Research as insured by National Union (Cunneen, O'Gorman and Rotella, attorneys).
*254 David W. MacGregor argued the cause for respondent American Cyanamid (Ozzard, Rizzolo, Klein, Mauro, Savo & Hogan, attorneys; David D. Fialk, on the brief).
Ann B. Krueger argued the cause for respondent Research Cottrell as insured by Travelers (Farabaugh, Frieland, Giles & Smith, attorneys).
Thomas E. Miller argued the cause for respondent Research Cottrell as insured by Liberty Mutual (Robert G. Bressler, attorney).
Alfred J. Hill argued the cause for respondent Falcon (Wilentz, Goldman & Spitzer, attorneys).
The opinion of the court was delivered by KING, P.J.A.D.
This appeal is taken from an award of compensation for occupational disability. Appellant Research Cottrell, Inc. challenges the award against it on three grounds claiming: (1) the judge erred in awarding disability at the 1980 rates where petitioner's employment and exposure ended in 1979, (2) the rule against apportionment of disability stated in Bond v. Rose Ribbon was incorrectly applied, (3) the judge erred in finding contributing exposure during petitioner's employment from August 1, 1978 to March 16, 1979. We disagree and affirm the judgment.
Petitioner Cyrus Falcon filed three occupational disability claim petitions for bladder cancer and related neuropsychiatric permanent disability naming American Cyanamid Company and Research Cottrell, Inc. as respondents. American Cyanamid employed the petitioner from 1939 until the early part of 1941. Research Cottrell employed petitioner from 1941 until March 16, 1979, excepting a period from 1942 to 1945 when Falcon was in the military. Petitioner was also employed by the Aim Corporation from May 30, 1979 until February 6, 1980 and Aim was joined in the case as part of the consolidated actions. The judge entered an award in favor of Falcon, charging Research *255 Cottrell, and its final insurer National Union Insurance Company with sole responsibility for the entire award which was assessed at the 1980 benefit rates. The judge established the "date of manifestation" as February 13, 1980. National Union, the final insurer for Research Cottrell, has appealed.
Petitioner worked for respondent American Cyanamid from October 1939 to April 1941. During much of this time he worked on the plant railroad moving drums containing various chemicals including sulfuric acid and beta naphthalamine (BNA). Spillage would often occur from these drums because of jostling in transit which would loosen the plugs which sealed the drums. The workmen would then have to handle the container, using only leather gloves as protection from the chemicals. The chemicals would invariably become impermeated in the gloves and when it rained they would wash through the gloves onto the workmen's hands. Falcon testified that he was a nail-biter at the time and probably frequently ingested chemicals including BNA through this habit. Over a period of a few days Falcon might handle 30 or 40 of these drums. Petitioner terminated his employment with American Cyanamid in February or March of 1941.
In April 1941 Falcon began working for respondent Research Cottrell, Inc. on a "bull gang." His duties included packing freight cars and generally helping out in the shipping of goods. During his time on the "bull gang" he would sometimes have to carry "cast iron doors" painted with a bitumastic tar paint which would not fully dry. Instead it would dry with a "skin" on top but if the skin broke, the softer material underneath would often get on the gloves which the workers wore for protection. From June 1942 to November 1945 Falcon was in the military. He returned to Research Cottrell when his tour of duty was finished and worked there for 18 months operating an acetylene burner. He then became a sheet metal mechanic, working his way through all "classes" of this position until 1967 when he was transferred to an office position in the same plant. As a sheet metal mechanic Falcon would operate all of *256 the machinery that processed the steel and, on a daily basis, he would get machine oils on his hands. He also would sometimes have to insulate some of the special units at the plant by covering them with chicken wire and then coating them with a bitumastic tar paint which would be applied with a trowel and then spread out with a large brush. The tar paint would often get on petitioner's hands while he was working. He only did this painting job occasionally, "not as a steady routine," simply to keep production on schedule in the plant, but when he did perform this work it would be over a period of a few days. A co-worker, Alan Cooper, testified that when he would apply the bitumastic tar paint he would also usually get it on his hands despite the fact that he was wearing gloves. Cooper also testified that there were 15 or so of these painting jobs per year in the 1950's and that this number declined from that time on.
After his transfer to office work in 1967, Falcon rarely came in contact with the bitumastic paint since he was only in the production area of the plant 10% of the time. However, sometimes he did inhale the "fumes"  actual visible droplets of paint in the air  if he was in an area where the painting was being done. This occurred at least through October or November of 1978. Research Cottrell closed the plant in March 1979 and Falcon consequently lost his job there.
Petitioner obtained his real estate license and then began working in a strictly office job for the Aim Corporation, a steel fabricator, in November 1980. He kept this position until November 1981 when his medical problems increased to a degree that he could no longer hold a regular job.
These medical problems began in the 1950's while he was a sheet metal mechanic. Falcon began developing recurring bladder infections every three to five years. These infections were accompanied by painful urination and pyorrhea  pus in the urine. His original physician was a Dr. Marcus whom he continued to see until the early 1970's when blood began to appear in his urine. This "new wrinkle" greatly upset Falcon. *257 He then was treated by a Dr. Anderson until 1979 who referred him to a urologist, Dr. Lifland. A cystoscopy was performed in February 1980 and petitioner eventually underwent a partial cystectomy for bladder cancer. This removal of part of his bladder has greatly affected Falcon. Urination is extremely painful for him because of the numerous cystoscopies he has undergone since the February 1980 diagnosis of bladder cancer (one every three months since the first operation) and, because of decreased bladder capacity, he must always be near a bathroom. Petitioner now feels "rather useless" since he cannot work and he hates the anxiety which he has concerning the inevitable return of the cancer so much that he sometimes wishes he would "get a heart attack and get it over with." Falcon has been diagnosed as up to 75% physically disabled because of his bladder cancer and the resulting operations he had undergone (the last of which occurred in December 1983) and up to 25% psychologically disabled from that disease. He has been diagnosed as having severe traumatic anxiety psychoneurosis with depression and suicidal ideation along with "cancerphobia."
The testimony varied as to the factors which likely caused the cancer. All of the four experts who testified agreed that the BNA played a substantial role in at least initiating the genetic changes necessary to cause the cancer. However, only plaintiff's expert, Dr. Susan Daum, believed that all the exposure to all of the possible carcinogens caused the disease. Research Cottrell's two experts testified that the exposure to the fumes from the bitumastic paint while National Union was the insurance carrier (from August 1, until the plant closed on March 16, 1979) could not have possibly contributed to the cancer, considering the long latency period which bladder cancer usually has and also the minimal exposure which plaintiff had at this time. For example, Dr. Jack York compared this exposure to a lung cancer patient who has an occasional cigarette which will not affect a tumor which has already begun cell division.
*258 Despite the testimony presented by Research Cottrell, the judge found Dr. Daum to be the most credible of the experts and awarded petitioner $99,900 (540 weeks at the 1980 rate of $185 per week based on a 75% physical disability and a 15% neuropsychiatric disability) to be paid fully by Research Cottrell through its final insurer, National Union. The calculation was made at the 1980 rate because the judge found the disease not to have manifested itself until February 13, 1980, when it was discovered at Somerset Medical Center.

I
The first issue we consider is whether it was error to decide that petitioner's employment with Research Cottrell while National Union was the carrier from August 1, 1978 until the date the plant closed on March 16, 1979, was a contributing cause of his bladder cancer. Research Cottrell was represented by three different insurance companies during the relevant time periods when petitioner was potentially exposed to the substances which caused his bladder cancer: Liberty Mutual from 1958 to July 31, 1968; Travelers from August 1, 1968 until July 31, 1978; and National Union from August 1, 1978 to March 16, 1979 when the plant was closed.[1] There is no doubt that logically under Bond v. Rose Ribbon and Carbon Mfg. Co., 42 N.J. 308 (1964), the entire payment in such a "latent manifestation" case must be made by only one of these carriers  the one whose coverage was in effect when Falcon was last exposed to carcinogens which contributed to his bladder cancer. See Giagnacovo v. Beggs Bros., 64 N.J. 32, 37-38 (1973). The judge found, based on Dr. Daum's testimony, that all of the exposures, including the final period of time during which National Union was the carrier, contributed to the cancer and, thus, charged the entire payment to National Union.
*259 We conclude that the judge's finding has substantial support in the record and affirm the fixing of liability against the carrier on the risk at the time of final exposure, National Union. See Close v. Kordulak, 44 N.J. 589 (1965). The judge specifically found
There is no argument but that the Petitioner's occupational exposure while employed by American Cyanamid and by Research Cottrell caused his bladder cancer. The only issues which the Court must resolve are the manifestation of that cancer and whether the exposure during any particular period of time, especially the latter periods of exposure while working at Research Cottrell, contributed in any significant degree to the development of his cancer. There is no question that after 1967 the Petitioner's exposure became significantly less. However, the Court is convinced that each individual exposure contributed to the ongoing bladder cancers.
Petitioner's expert, Dr. Daum, carefully explained why that in fact is the case and documents that testimony with detailed reference to medical literature. This in the estimation of the Court is the sort of case in which the doctrine enunciated in the matter of Bond v. Rose Ribbon Carbon & Mfg. Co., 42 N.J. 308 (1964), must be applied since it is impossible for the Court to distinguish the responsibility of each of the employers and their insurance carriers to the development of this insidious condition. With reference to the manifestation of this cancer the Court establishes that manifestation to be the date of admission and surgery of Cyrus Falcon to the Somerset Medical Center on February 13, 1980. While it might be argued that the so-called bladder infections were early manifestations of this developing cancer, they do not meet the test of manifestation for compensation purposes that the condition must be fixed, arrested and measurable.
This finding is not arbitrary or capricious and we must accept it if it has evidential support. Ibid. Although the rule of Bond v. Rose Ribbon was acknowledged to be "admittedly arbitrary," its alternative was concededly a "morass." 42 N.J. at 311.

II
Next we consider National Union's contention that the adoption of a "manifestation date" of February 13, 1980 was in error. Again, we conclude that there is substantial credible evidence in the record to support the judge's finding. Discovery or manifestation is defined in Bond, 42 N.J. at 311, as either diagnosis by medical examination, manifest loss of physical function, or incapacity to work. None of these occurred until after the petitioner was no longer employed at Research *260 Cottrell. This brings the case into the "latent manifestation" classification to which Bond applies the "admittedly arbitrary" but also "fairest and most workable" system of placing the burden of payment on the final carrier of the last company which caused the petitioner to be exposed to the damaging material. Id. at 311. Admittedly, there was testimony from appellant's experts that some symptoms became manifest earlier than the time when National Union's coverage began. However, there was also testimony that the earlier problems which petitioner had were mere "infections", not cancer. There was no testimony from any physicians who treated petitioner when he was still employed by Research Cottrell. Thus, the judge had the unenviable job of evaluating the testimony of three seemingly credible experts and deciding who was the most credible. The decision not to believe the testimony that the disease was manifest before the February 1980 diagnosis was supported by substantial credible evidence that the prior infections were merely "pre-malignant" and not necessarily symptoms of cancer. Considering the absolute absence of any physician's first-hand testimony concerning the prior infections, it was up to the judge to decide what the real story was and she came to a perfectly reasonable conclusion. In the circumstance we cannot quarrel with the judge's finding of fact that the "manifestation [of petitioner's condition] for compensation purposes" became "fixed, arrested and measurable" on "the date of admission and surgery of Cyrus Falcon to the Somerset Medical Center on February 13, 1980."

III
The final question is the one of appropriate rate of the award. The claim petition was filed in February 1981 and conceded that the date of last exposure was March 16, 1979. The 1980 rates yield a total award of $99,900; the pre-1980 rates yield an award of $19,800.
*261 Two cases are central to the appellant's argument, Rybski v. Johns-Manville Products Corp., 185 N.J. Super. 433 (App.Div. 1982), and Drabich v. Johns-Manville Sales Corp., (unreported decision, A-5656-84T1, (Part B, King, O'Brien and Scalera) decided July 1, 1986, certification denied, 107 N.J. 34 (1986)).[2]
In Rybski the court found that L. 1979, c. 283, § 19, codified as a note to N.J.S.A. 34:15-7, as amended, barred retroactive application of the 1980 rates where the petition was filed before 1980 and when the disease had patently manifested itself prior to that date. 185 N.J. Super. at 436, 437. The Drabich court extended this analysis further by not considering the filing date as "critical." Instead, the time of the manifestation of the disease was declared the point from which the rate of the payments should be calculated so that even a claim petition filed after 1980 would be controlled by pre-1980 rates if the disease had manifested itself prior to 1980. In the case before us, we distinguish the Rybski facts; we also conclude that appellant's reliance on Drabich is misplaced.
In Rybski both the manifestation of the disease and the filing of the petition occurred before 1980; it would have been a clear violation of the statute to allow payment at the 1980 rates. However, in the present case, the manifestation of the disease, as defined by the Supreme Court in Bond v. Ross Ribbon and Carbon Mfg. Co., 42 N.J. at 311, as "revelation of its existence *262 by medical examination, work incapacity, or manifest loss of physical function," did not occur until the actual diagnosis in February 1980. In other words, none of the Bond definitions of manifestation were satisfied until after January 10, 1980 (the date of the rate increase) since diagnosis, incapacity to work (petitioner did not stop working completely until November 1981), and manifest loss of physical function (partial cystectomy severely reduced bladder capacity plus numerous post-1980 cystoscopies caused incontinence) all occurred after that date. Drabich is distinguishable for the same reason. In that case, although the petition was filed in 1982, the asbestosis had been manifest prior to 1980. Drabich is not analogous to the present case because of this pre-1980 manifestation of the disease. We quote from Drabich at length to demonstrate why that case is so different than this case.
Petitioner [Drabich] worked for respondent-employer from October 1946 to July 1977 when he retired because of a heart attack. During this period he was exposed to asbestos and other occupational irritants which caused his lung disease. Johns-Manville made voluntary payments in the amount of 25% of partial total  15% in February 1977, 5% in May 1980 and 5% in July 1980. Petitioner filed this claim petition on June 26, 1982 or within two years of his receipt of the last voluntary payment.
At the hearing petitioner relied on Doctor Susan Daum who said that he had chronic bronchitis with small airways disease and pleural and pulmonary asbestosis. She initially assessed disability at 65% of total and later at 100% of total. Dr. Tucker established occupational disability at 50% of total on behalf of the respondent. The judge found 60% of total disability and applied the rates applicable at the time of "manifestation"  1982. We disagree with the later finding.

L. 1979, c. 283, § 19, codified as a note to N.J.S.A. 34:15-7, as amended, states
The provisions of the amendatory and supplementary act shall apply to accidents and occupational disease exposures which occur on or after January 1, 1980 and shall not be applied retroactively to accidents or occupational diseases occurring prior to January 1, 1980 except to cases where claim is made for an occupational disease characterized by latent manifestation as set forth in R.S. 34:15-34.
The retroactive application of the amendments to the Workers' Compensation Act, codified as L. 1979, c. 283 (The "Reform Act"), was treated in our opinion in Rybski v. Johns-Manville Prods. Corp., 185 N.J. Super. 433 (App.Div. 1982). In June 1979 the petitioner in Rybski filed a claim against his employer for partial total permanent disability resulting from an occupational exposure to hazardous substance which had been continuous since 1956. The judge of compensation *263 awarded him 5% of partial total permanent disability. The judge also concluded that the Reform Act was not retroactively applicable to the petitioner's claim which was filed before the effective date of the amendment and was based on manifestations of an occupational disease appearing before January 1, 1980.
We affirm the judge's finding
by the express terms of § 19, the amendatory act is not applicable here for two reasons. First, the occupational disease exposures upon which this petition was based occurred prior to January 1, 1980, and the amendatory act does not apply retroactively to such exposures. Second, the final clause of § 19 by the nature of its reference to N.J.S.A. 34:15-34, is not construable as excepting from the rule of nonretroactivity those occupational disease exposures resulting in symptomatology patently manifested prior to January 1, 1980, and on the basis of which claim petitions were filed prior to that date. [185 N.J. Super. at 436-437].
The judge in the case before us found that the provisions of the Reform Act apply to the petitioner's claim based upon an erroneous determination that manifestation of an occupational disease is determined when the disease is established or "fixed" by an estimate of disability.
He said:
The medical records of the respondent show a progression of the petitioner's pulmonary condition, beginning back as early as 1969. This condition continued to progress until there was a manifestation of disability within the meaning of the New Jersey Law in 1982 when the disability was fixed by Dr. Daum.
An internal medical condition such as petitioner's pulmonary disability is manifested by medical evaluation, which fixes the disability.
Although petitioner was examined by Dr. Edelman in 1980, Dr. Edelman did not estimate the permanent partial disability at that time. There was clear evidence of the existence of the pulmonary disability in 1980, based upon the findings of Dr. Edelman, but without the fixing of disability, this examination of Dr. Edelman does not constitute a manifestation within the meaning of our law.
Under the facts of this case, it is uncontroverted that the petitioner had a continuing and progressive pulmonary disability from at least the 1960's up through the present time. Such a condition can only be manifested under our law when the disability is fixed after medical evaluation.
The judge's ruling that, under N.J.S.A. 34:15-1 et seq., the time of the estimate of disability rendered by an examining physician "fixes" the date of manifestation of an occupationally related disease is without support in our Workers' Compensation laws. The judge acknowledged that petitioner's asbestos is was patently manifest prior to January 1, 1980. Also uncontroverted is the fact that petitioner's occupational exposure terminated in 1977 when he stopped working after his heart attack. Therefore, under the analysis in Rybski, the provisions of the Reform Act could not have been applied retroactively to the claim.

*264 A latent and progressive occupational disease is manifested upon the ultimate revelation of its existence by medical examination, work incapacity, or manifest loss of physical function. See Bond v. Rose Ribbon & Carbon Mfg. Co., 42 N.J. 308, 311 (1964); Biglioli v. Durotest Corp., 26 N.J. 33, 42-43 (1958). The record before us clearly shows that petitioner suffered from a pulmonary disease which had become manifest prior to 1980. Reports of x-ray examinations taken in July 1977, subsequent to his myocardial infarction, indicate stranding abnormal density in both lower lung fields which appeared to be marked pleural thickening along the lateral thoracic margins particularly on the right side. These findings confirmed occupational exposure to asbestos, chronic in nature. Petitioner accepted voluntary payments of compensation for his occupationally related lung condition on February 15, 1977, May 13, 1980, and July 16, 1980. These payments from respondent to petitioner represented a voluntary settlement for 25% of partial total permanent disability.
We do not consider the filing of the claim petition here in 1982, as opposed to the filing date in Rybski in June 1979, see 185 N.J. Super. at 436, as critical. The salient events which determine retroactive application of the Reform Act are either occupational exposure after January 1, 1980, or latent manifestation of an occupational disease resulting from that exposure after January 1, 1980.
While the completed exposures in Rybski, Drabich, and Falcon all occurred before the effective date, January 10, 1980, of the new rates, Falcon's occupational disease alone was legally manifest only after that date. The Legislature clearly stated that exposures prior to January 1980 are controlled by the former act and rates but that "occupational diseases characterized by latent manifestation as set forth in R.S. 34:15-34" are controlled by the 1980 Amendments. In 34:15-34 the Legislature said that its "express intention" was to provide for nonretroactivity (on the increased rates), except in occupational disease cases with latent manifestations where only pre-January 1980 exposures had occurred. N.J.S.A. 34:15-34; L. 1979, c. 283 § 11, eff. January 10, 1980.
Although it is arguable that Falcon had symptoms of bladder cancer prior to 1980, there was no conclusive evidence to this effect. We may reverse only if the judge's finding was unsupported by substantial credible evidence and that is an impossible conclusion for us to reach when none of the three Bond criteria were met until 1980 or later. We find that it is certainly within reason that the early symptoms which Falcon had, such as blood in the urine and irritation, were only related *265 to the infection or were, as Dr. Daum testified, "premalignant" symptoms but not signs of actual cancerous growth. This court is not to weigh the evidence as would a trial judge and it was certainly within the power of the judge to choose to believe one seemingly credible witness (Daum) over another (Bonomo) who contradicted the prior testimony by stating that when Falcon developed pus in his urine in the 1950's, the cancerous growth had begun.
Finally, we find no error in the judge conforming the final award as to rate of compensation to comply with the proofs and her legal findings. See Panzino v. Continental Can Co., 71 N.J. 298 (1976).
Affirmed.
NOTES
[1] American Cyanamid Company was joined because of an employment period of about ten months in 1939-1940 and obtained a dismissal in the Division.
[2] We depart from the admonition of R. 1:36-3 to some extent by mentioning the unreported Drabich opinion. However, we do not "cite" it as authority so we do not actually violate the rule. We mention the Drabich opinion as an historical fact because it was quite properly briefed and argued to the court by the parties. See Pressler, Current N.J. Court Rules, Comment R. 1:36-3.

The rule does, however, permit unpublished opinions to be called to the attention of any court by parties by way of secondary research materials provided the party so using the unpublished opinion provide all other parties and the court not only with the full text thereof but also with all other relevant unpublished opinions known to him, including those adverse to his client's position.