781 A.2d 58 (2001)
344 N.J. Super. 169
Joseph PECK, Jr., Petitioner-Respondent,
v.
NEWARK MORNING LEDGER COMPANY, Respondent-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 2001.
Decided October 5, 2001.
*60 Thomas P. Scrivo, Morristown, argued the cause for appellant (McElroy, Deutsch & Mulvaney, attorneys; Mr. Scrivo, of counsel and on the brief; Richard J. Williams, Jr., also on the brief).
Paul A. Schwartz argued the cause for respondent (Goldstein, Ballen, O'Rourke & Wildstein, Passaic, attorneys; Mr. Schwartz, on the brief).
Before Judges PETRELLA, KESTIN and ALLEY.
*59 The opinion of the court was delivered by PETRELLA, P.J.A.D.
Petitioner Joseph Peck was awarded permanent disability by the Division of Workers' Compensation for a carpal tunnel condition of his left and right hands as a result of conditions he was exposed to from working as a mailer for the Newark Morning Ledger Company (Ledger).
On April 18, 1997, Peck filed two claim petitions with the Division of Workers' *61 Compensation, alleging that he suffers from carpal tunnel syndrome of the right and left hands, and related orthopedic, neurological, and neuropsychiatric disabilities as a result of the constant use of his hands while employed by Ledger.
After answering the claim petitions, Ledger moved to dismiss them. The Judge of Compensation heard testimony in connection with the motion from four witnesses and received written submissions from the parties and the Uninsured Employers Fund. The Judge of Compensation then denied Ledger's motion to dismiss in a March 13, 2000 order and written decision.[1] The Compensation Judge thereafter entered judgment in favor of Peck on both of his claim petitions, awarding him a permanent disability award of 17½% of the right hand and 20% of the left hand. Ledger appealed from the final judgment.
Ledger argues on appeal: (1) its Article I election notice complied with the Workers' Compensation Act (Act); (2) the Article I election was timely; and (3) there was no violation of public policy. Ledger also asserts that it was adequately insured pursuant to the requirements of N.J.S.A. 34:15-72.
Petitioner Joseph Peck was employed as a mailer for The Star-Ledger newspaper, a publication of Ledger, since December 25, 1976. He testified that he became a fulltime employee with full benefits in or about 1979. In December 1995, after months of pain and numbness in his hands, Peck was examined by Dr. Nenna, an orthopaedist, who opined that Peck was suffering from bilateral carpal tunnel syndrome and recommended surgery. Peck underwent surgery for his left and right hands in 1996 and 1997, respectively. The parties agree that the medical treatment rendered to Peck was reasonable and necessary for his carpal tunnel condition.
Peck testified that he first signed a waiver document[2] on September 26, 1984, and that it was his understanding that if he did not sign the waiver, his employment with the company would be terminated. Peck testified that he was subsequently asked to sign another waiver because he was told that the company lost the first one.[3] He was under the impression, based upon discussions with his co-workers and *62 the union president, that the waivers were only a bar to hearing disability claims. Peck is unsure whether he signed the second waiver before or after the onset of symptoms of his carpal tunnel condition. Beginning around 1979, the Article I election notice was also incorporated in Section 15 of the collective bargaining agreement between Ledger and its employees represented by the Newark Mailers Union, Local 11.
Bernard Arnold, general foreman of the mailroom, testified that he was told, and was under the impression, that the purpose of the waiver was to eliminate hearing loss claims. Arnold recalled first signing a waiver in 1979, and he was told he would be fired if he did not sign the waiver. He also recalled being informed by the union that an occupational disease was "[a]nything other than falling down and breaking your leg or arm...."
Bruce Berry, counsel for Ledger, testified that Ledger's motivation for electing Article I coverage was concern over "the fact that many workers' compensation claims for occupational disease had been filed by mailers." He stated that most of the mailers were previously employed as mailers by a newspaper that closed in the early 1970s, and that the mailers filed workers' compensation claims with the Ledger for conditions they were exposed to while employed by that newspaper. Berry recommended that the waiver language be placed in the collective bargaining agreements with Peck's union, which was done in each agreement commencing in 1979. Berry testified that the waiver was required to be signed by the mailers in 1979, 1984, and again in 1996 or 1997. He said that the waiver specifically applied to mailers and anyone who did not sign it would no longer be employed by the company as it was a condition of their continued employment.
John Starkes, Vice-President and Claims Manager of John L. Gwydir Co., Ledger's insurance brokers, testified that Liberty Mutual Insurance Company insured the Ledger under a workers' compensation policy that covers all of its employees both for general compensation claims under Article II (Part I of the policy) and for occupational claims under Article I of the Act (Part II of the policy).

I.
Ledger argues that Compensation Judge Calderone erred in denying its motion to dismiss because its Article I election notice complied with the applicable provisions of the Act (N.J.S.A. 34:15-1 et seq.).
N.J.S.A. 34:15-9 provides, in pertinent part, that:
Every contract of hiring ... shall be presumed to have been made with reference to the provisions of [Article II], and unless there be as a part of such contract an express statement in writing prior to any accident, either in the contract itself or by written notice from either party to the other, that the provisions of [Article II] are not intended to apply, then it shall be presumed that the parties have accepted the provisions of [Article II] and have agreed to be bound thereby.
[Emphasis added.]
There is a presumption that employers and employees accept the provisions of Article II of the Act (N.J.S.A. 34:15-7 et seq.) unless there is an express written election not to be bound by the article.[4] In the case of such an election, *63 the provisions of Article I apply,[5] and an employee who is not willfully negligent has a negligence action against his or her employer for damages for injuries "by accident arising out of and in the course of ... employment." N.J.S.A. 34:15-1.
As stated in Naseef v. Cord, Inc., 48 N.J. 317, 322-323, 225 A.2d 343 (1966):
New Jersey has what is commonly known as an "elective system" of workmen's compensation. [citation omitted]. Under this system either the employer or employee may reject the ordinary system of compensatory non-fault liability (in New Jersey, Article II coverage), thus leaving the employer liable to his employee for only common-law negligence (in New Jersey, Article I coverage).
In the case of Article I coverage, the employee's claim may not be defeated by the defenses of ordinary contributory negligence ..., assumption of risk ..., or negligence of a fellow-employee .... [citations omitted]. Most employers are thereby led to accept liability without fault according to Article II of the Workmen's Compensation Act. [footnote omitted].

* * *
Not only may the parties enter into an agreement that [Article II] shall not apply, but also either the employer or the employee may make this selection so long as he gives written notice to the other prior to a compensable accident.... [T]he required notice must be clear and comprehensible so that the recipient of the notice understands the purport of the contract provision or the written notice. [Citations omitted.]
In finding that the employer's notice was insufficient, Naseef held:
Under this liberal approach, an employer who wishes to deprive his employees of their workmen's compensation benefits under Article II must strictly comply with the statute. Such an election by an employer is insufficient if it fails to give clear written notice that Article II will not apply and if it indicates to the workman that he has no rights whatsoever under either article of the workmen's compensation statute.
Id. at 326, 225 A.2d 343 (emphasis added).
Ledger asserts that an Article I election notice is valid so long as it is objectively clear and that evidence of the employee's subjective understanding is irrelevant. However, in Royal Insurance Co. v. Pohlman, *64 95 N.J.A.R.2d (WCC) 83, 86 (1994), the Compensation Judge held:
The gist of Naseef and the statutory and decisional law cited therein is that an agreement to be bound by Article I rather than Article II cannot be enforced unless: (a) It is in writing; (b) it spells out in very precise and unambiguous language the fact that both parties know that they are entitled to be bound either by Article I or Article II; (c) it describes in exact detail the benefits which each party would receive under Article I and Article II as well as the risks inherent in rejecting Article II in favor of Article I; (d) it was made prior to the occurrence of an injury or illness; (e) there is independent evidence to show that the parties understood exactly what they were getting and what they were giving up when they agreed to the election and that neither party agreed to the election because of fraud, duress, misrepresentation or undue influence.
[Emphasis added].
In Licata v. Lutz, 48 N.J. 255, 259, 225 A.2d 127 (1966), the Court, citing Naseef, emphasized the importance of the employee's understanding, stating that "the success or failure of [the notice at issue] depends upon whether, considering all the circumstances, it was understood by the employee that he was not to have the benefits of Article II coverage." Therefore, it is clear that evidence of the employee's understanding of the Article I election notice is necessary for the notice to be enforceable. It is doubtful that inclusion of such a waiver in a collective bargaining agreement could satisfy the requirements of Licata or Naseef, and we are satisfied here that the contract provision was not a proper substitute for an individual waiver.
Compensation Judge Calderone thoroughly reviewed the relevant authorities and stated:
My review evidences no case where the Article I election process and notice have been upheld. The case law also clearly emphasizes the statutory presumption for Article II coverage and the strict requirements that have been imposed for a valid Article I selection.
I was impressed by petitioner's appearance and demeanor and found his testimony clear, consistent and trustworthy. In particular, it was evident that petitioner has no real understanding of the waiver notice presented at trial (R-1). In particular, he had great difficulty reading the waiver which was given to him to be signed on the threat of employment loss. I also accept as fact his testimony that he believed the waivers he was required to sign only affected or denied the filing of hearing loss claims that had apparently been an area of contention between management and the mailers. Mr. Arnold's testimony in some respects also focused on the confusion and lack of clarity concerning the waiver provisions. In particular, the union presentations as detailed by Mr. Arnold included varying interpretations of what was included under the occupational disease category. This raises serious doubts that a full understanding of the mailers' workers' compensation rights or attempted curtailment of rights was ever meaningfully explored. Further, as I will discuss below, the waiver provision in evidence was ambiguous concerning the legal options available to the mailers for work accidents and/or occupational illnesses.
Mr. Barry's testimony, in my judgment, exhibited a lack of understanding of New Jersey's workers' compensation system and its purposes. He first presented respondent's concerns about the *65 number of occupational claims being filed. However, the way respondent attempted to deal with the issue through its negotiations posture and employee termination threats seems out of character for a newspaper that is often viewed as progressive and thoughtful. Clearly, respondent could have contested in this court any claims that it considered to be noncompensable. While no one from the union testified, it is difficult to understand the union's acceptance of the waiver provision as finalized in its bargaining agreements. Mr. Stakes's testimony also failed to demonstrate a clear knowledge of the workers' compensation program in New Jersey, the effect of the waiver on employees and their dependents and respondent's overall insurance coverage with respect to the mailers.
Having considered the full record in these cases, I make the following findings of fact and conclusions of law:
1. Respondent's attempted waiver or Article I election for only occupational claims by the mailers is invalid.
The workers' compensation law is an integrated program under Article II and there is no basis or legislative authority to separate sections or areas of coverage under Article II for an Article I election. In Giambattista v. Thomas A. Edison, Inc., 32 N.J.Super. 103, 112, 107 A.2d 801 (App.Div.1954), the court discussed the history of occupational claims and found that "[o]ur current occupational disease sections, by reason of their historical development and that [sic] fact they are clearly an integrated part of the system of compensation, must be interpreted and construed in the light of the same general principles as are applied in cases of injury or death from accident." See also, Textileather Corp. v. Great American Indemnity Co., 108 N.J.L. 121, 156 A. 840 (E & A 1931). Moreover, N.J.S.A. 34:15-8, provides that Article II coverage requires "an acceptance of all the provisions of this article."
The sections applicable to an Article I election, see N.J.S.A. 34:15-1 and N.J.S.A. 34:15-9, speak only to accident cases since these sections were enacted prior to the inclusion of occupational claims in the workers' compensation program. Subsequently enacted N.J.S.A. 34:15-35 provides that "[a]ll provisions of this article [Article II] and article 3 of the title (Section 34:15-36 et seq.), applicable to claims for injury or death by accident, shall apply to injury or death by compensable occupational disease...." Additionally, N.J.S.A. 34:15-32 provides comparable benefit programs for accidents and occupational disabilities. It could be argued that while Article II was amended to include occupational claims, the Article I election sections were not modified to allow for the waiver or opting-out of occupational claims. Under such an interpretation, only accident claims could be covered under an Article I election. However, a more useful and logical interpretation would be that N.J.S.A. 34:15-9 now includes both accident and occupational claims as a package with respect to the election provisions which would maintain the overall integration of the workers' compensation system.
While there are some specific statutory sections and definitions to only occupational claims, the organization, process and policy guidelines encompass one system for both workplace accidents and occupational illnesses. To accept respondent's theory that an Article I election can be fashioned unilaterally to eliminate sections of Article II coverage and apply to only targeted workers can create obvious mischief, unfairness and confusion. In particular, it is evident to *66 those of us who are familiar with workers' compensation proceedings that certain job categories or employees have a greater risk or potential for occupational and/or accident claims. For instance, if respondent's pick and choose system were available, chemical workers exposed to pulmonary irritants, clerical and machine operators exposed to repetitive motions and plant workers exposed to excessively loud noises could find many employers opting-out of only Article II occupational coverage. Such employers would likely attempt however to retain Article II accident coverage where accident liability claims have the potential for large court or jury awards. Within the same work site, categories of workers such as respondent's mailers could be singled out for one type of Article II coverage while different mixes of coverage could be implemented for other categories of workers. In fact, to accept respondent's theory, each individual worker could be subject to various elections by management. There are also many cases where an employee files accident and occupational claims for overlapping disabilities which would make this separation of accident and occupational cases unworkable. See Peterson v. Hermann Forwarding Co., 267 N.J.Super. 493, 631 A.2d 1274 (App.Div.1993), certif. den. 135 N.J. 304, 639A.2d 303 (1994).
While there is little direct case law in this area, the Supreme Court of South Carolina, an elective state, has addressed similar legal and policy concerns in Kennerly v. Ocmulgee Lumber Co., 206 S.C. 481, 34 S.E.2d 792 (1945). That Court found workers' compensation coverage where an employee of a subcontractor who had elected the negligence system was killed when engaging in logging operations for a sawmill operator whose own employees had workers' compensation protections. In finding that all the employees involved whether directly employed by the sawmill or the subcontractor would be found included in the workers' compensation system, the Court held at 795:
The Act does not permit an employer to come under the terms thereof for one part of his business and remain out as to another part of the business where, as in this case, it is substantially and necessarily conducted as one business. It was not the intention of the Legislature that the Act could be accepted in part and rejected in part.
It also noted that troublesome issues could occur if employees for the same employer or operation were separated in liability and workers' compensation categories. Such a line of demarcation between employees would likely result in administrative problems, confusion and inefficiency.
The uniform and comprehensive workers' compensation system in New Jersey has provided stability for insurers, employers and workers. There would also be obvious problems in the workers' compensation rate setting programs and a clear potential for fraud and abuse if unilateral and changing coverage options were allowable as maintained by respondent. Moreover, respondent has presented no legislative or policy support for its separation of accident and occupational claims under the Article I and II process. To the contrary, Article II presents a successful and longstanding integration of accident and occupational disability claims that cannot be separated through the waiver here at issue.
Compensation Judge Calderone also considered the election notice poorly drafted, confusing and ambiguous. He stated: *67 The lack of clarity was also exhibited through the testimony of petitioner and Mr. Arnold. Petitioner considered that only hearing claims were eliminated by the notice, while Mr. Arnold presented the limited union meeting explanations. Clearly, the mailers like most workers would have difficulty in understanding legalistic terms such as Article I and II and "compensable occupational claims" as contained in the notice. Moreover, the notice fails to explain that accident claims would still be reviewable under workers' compensation procedures. Such an ambiguous and limited notice would not comply with the intent and purpose of the workers' compensation act and is invalid. See Naseef, supra.
Moreover, the manner of implementation through threats of job forfeiture for failing to sign the notice are troubling and undermine the attempted election process. The New Jersey Supreme Court in Kibble v. Weeks Dredging & Construction Co., 161 N.J. 178, 735 A.2d 1142 (1999), recently held that the release or waiver of an individual's potential future dependency rights must be knowingly, intelligently and voluntarily made. Such a standard would be even more important in a matter such as the present case when a respondent attempts to adversely change the workers' compensation rights of current employees. There is no doubt based on petitioner's credible testimony that his signature on the notice was neither a free nor informed decision. The notice cannot in any sense be considered a mutual agreement with petitioner. Moreover, had respondent taken any adverse action against petitioner, it would appear that petitioner would have had a cause of action under N.J.S.A. 34:15-39.1 for interference with petitioner's workers' compensation rights. The union agreement as a private contract also cannot be accepted as binding or allowing the loss of petitioner's statutory rights and benefits under these circumstances.
In the instant case, there is sufficient basis in the record to support the Compensation Judge's finding that Ledger's attempted Article I election is invalid because the notice was unclear and Peck did not understand its meaning. The notice did not define "compensable occupational diseases" [6] or what was meant by the references to Article I and Article II of the Act. Thus, sufficient credible evidence supports the judge's finding that clear written notice, as required by Naseef and its progeny, of the Article I election was not provided to Peck.
The requirement for clear and unambiguous language is compounded when consideration is given to the undisputed fact that the mailers were told they would be fired unless they signed the notice. As Berry testified, "if the employees did not sign this waiver, they would no longer be employed by the company. It was going to be a condition of their employment for new and continued employment. For new employees if they did not sign the waiver, they would not go to *68 work." Peck and Arnold both testified that they signed the waiver because they were told they would otherwise be fired. In fact, Arnold testified that if he was not told he would be fired, he would have probably sought the advice of counsel before deciding whether to sign the waiver. This supports Compensation Judge Calderone's finding of duress and undue influence. As noted, Royal Insurance expressly states that undue influence renders the waiver unenforceable and Kibble v. Weeks Dredging & Construction Co., 161 N.J. 178, 735 A.2d 1142 (1999), holds that duress may prevent an employee from knowingly, voluntarily, and intelligently choosing to accept or reject the waiver.[7]
Finally, as Compensation Judge Calderone observed, Ledger's attempt to specifically elect Article I for occupational claims by mailers could create unfairness. Ledger's motivation for electing Article I coverage was expressed as concern over "the fact that many workers' compensation claims for occupational disease had been filed by mailers." We agree with the Compensation Judge that public policy disfavors this "pick and choose" system. Hence, we conclude that the waiver of Article II coverage signed by Peck was ineffective. Our decision is reinforced by the longstanding principles of respect accorded to the interpretation of statutes and policy determinations by the agency charged with their enforcement and application. See Brady v. Department of Personnel, 149 N.J. 244, 256, 693 A.2d 466 (1997); Mayflower Securities Co., Inc. v. Bureau of Securities, 64 N.J. 85, 93, 312 A.2d 497 (1973).

II.
Ledger argues that an Article I election notice may be issued at anytime from the commencement of the employment relationship up to the date the employee manifests any alleged occupational disease, and thus may be issued after an employee has been exposed to an alleged occupational hazard.
N.J.S.A. 34:15-9 provides that an Article I election may be made "prior to any accident." See, e.g., John Hancock Mutual Life Insurance Co. v. Lieb, 11 N.J. Misc. 316, 165 A. 720 (1933), aff'd o.b. 113 N.J.L. 34, 172 A. 566 (1934). Case law is not definitive on whether an Article I election must be made prior to occupational hazard exposure rather than disease manifestation.
An employee's recovery under the Act does not differ merely because a claim can be labeled as being an "accident" or an "occupational disease." Williams v. Western Electric Company, 178 N.J.Super. 571, 578, 429 A.2d 1063 (App.Div.1981); see also Giambattista v. Thomas A. Edison, 32 N.J.Super. 103, 112, 107 A.2d 801 (App.Div.1954) ("Our current occupational disease sections, by reason of their historical development and the fact they are clearly an integrated part of the system of compensation law, must be interpreted and construed in light of the same general principles as are applied in cases of injury or death from accident."). The *69 Compensation Judge ruled that such an election must be made prior to the employee's exposure to the alleged occupational hazard. We agree with Judge Calderone's opinion in this regard. He stated:
Under the R-1 Notice, it is provided that Article II rights are waived as to "any claims you may make for death or injury resulting from compensable occupational claims as of the date of signing." It is first noted that the petitioner's dependents, not petitioner, would file any death or dependency claim in the event petitioner's death is alleged to be causally related to his employment. Such dependents have not waived their rights, see Kibble, supra, and the R-1 notice might not be effective against them. Moreover, N.J.S.A. 34:15-34 and our courts have recognized that the period for filing an occupational claim does not run until two years after the date the worker knew the nature of the occupational disability and its relationship to employment. Earl v. Johnson and Johnson, 158 N.J. 155, 728 A.2d 820 (1999). This is particularly important in those situations concerning latent diseases such as cancers or asbestosis where the exposure period may have been years or decades prior to the manifestation of the occupational disease and/or disability. See, Falcon v. American Cyanamid, 221 N.J.Super. 252, 534 A.2d 403 (App.Div.1987). Textileather, supra, a seminal occupational disability case whose language is still applicable to today's workplace illnesses, held at 123, 156 A. 840:
It is a well-known fact that industrial diseases are gradual in developmentthe first and early steps are not always perceptible. The rate of progress may vary.... Sometimes that disease is quiescent and latent; sometimes the fatal course is swift.
Medical science cannot always detect and describe the progress of disease.
See also, Electronic Associates, Inc. v. Heisinger, 111 N.J.Super. 15, 266 A.2d 601 (App.Div.1970), which applies occupational disease filing standards in a carpal tunnel situation.
There is no dispute in the present matter that petitioner was exposed to occupational repetitive motions since the start of his employment for which his carpal tunnel claim petitions are based. Respondent apparently argues that since the carpal tunnel manifested after the waiver was first signed, the claims cannot be processed under Article II procedures. There is a clear potential for abuse in respondent's position. For instance, under respondent's view, employees who have been exposed to known carcinogens for many years but have not as yet manifested disease could have their workers' compensation rights unilaterally terminated simply through an Article I selection by management. Similarly, an employer, prior to a plant or operations closing, could initiate a unilateral Article I selection and bar any occupational claims by the now displaced workers and their dependents under respondent's interpretation. It is also noted that the respondent had a new waiver for each labor agreement and each specific waiver apparently ended with the life of the particular labor contract. Such a process by respondent of periodic Article I selections is clearly unreasonable in setting a workable system for occupational disease claims.
As previously noted, N.J.S.A. 34:15-9 was enacted prior to the inclusion of occupational claims in the workers' compensation system and specifically provides that an Article I election must occur prior to an accident. Besides the other requirements for a valid Article I process, it is evident that with the inclusion *70 of occupational claims in Article II, an Article I election must now also occur prior to occupational exposure rather than disease manifestation for the process to be valid.

III.
Ledger argues that, pursuant N.J.S.A. 34:15-72, it is adequately insured for any liability that may be imposed upon it.[8]
N.J.S.A. 34:15-72 provides:
In like manner every employer except the state or a municipality, county or school district who is now or hereafter becomes subject to the provisions of Article I of this chapter (§ 34:15-1 et seq.) shall forthwith make sufficient provision for the complete payment of any obligation which he may incur to an injured employee or his administrators or next of kin under said Article I of this chapter.
Under the statute employers are required to obtain "sufficient coverage for the payment of any obligation it might incur on account of bodily injuries to an employee." Schmidt v. Smith, 155 N.J. 44, 51, 713 A.2d 1014 (1998).
The Vice-President and Claims Manager of Ledger's insurance brokers testified that occupational disease claims brought by mailers pursuant to Article I would be covered under section 3B of Ledger's insurance policy, which is the employers liability insurance section applicable to all employees. The section applies to "bodily injury by accident or bodily injury by disease" that "arise[s] out of and in the course of the injured employee's employment..."
Included in the policy is endorsement WC 29 03 01, which states:
This endorsement applies only to the insurance provided by Part Two (Employers Liability Insurance) because New Jersey is shown in item 3.A of the Information Page.
We may not limit our liability to pay damages for which we become legally liable to pay because of bodily injury to your employees if the bodily injury arises out of and in the course of employment that is subject to, and is compensable under, the workers compensation law of New Jersey.[9]
Thus, there are no limits on coverage for occupational disease claims brought in New Jersey. The Workers' Compensation Judge's finding that Ledger failed to satisfy the requirements of N.J.S.A. 34:15-72 is in error, based on differences in the record. However, in light of our decision the error was harmless.
Affirmed.
NOTES
[1] Ledger's motion for leave to appeal was denied.
[2] The document reads as follows:

NOTICE
You are hereby notified that you have waived the terms, provisions and benefits provided for by Article II of the New Jersey Workmen's Compensation Act as relate to any claims you may make for death or injury resulting from compensable occupational diseases as of the date of signing. In the event that you make such a claim for death or injury resulting from compensable occupational diseases from the date signing, such claim shall be governed and bound by Article I of said Workmen's Compensation Act. It is understood that this letter is notice to the Employee, as required by said Workmen's Compensation Act, that the provisions of Article II of said Workmen's Compensation Act as relate to occupational diseases are not to be applied, and is notice by the employee to the employer of his consent thereto.
NEWARK MORNING LEDGER CO.
I, Joseph Peck Jr. (print name), acknowledge that I have read the above notice, and fully understand that any claims I may make for disability or death resulting from compensable occupational diseases as an employee of Newark Morning Ledger Co. shall not be governed by Article II of the New Jersey Workmen's Compensation Act, but by the terms and provisions of Article I of said Workmen's Compensation Act.
 s/Joseph Peck Jr.
 (signature of employee)
 9/26/84
 (Date of signature)

[3] Although the 1984 waiver form is included in the record, the subsequent waiver form is not.
[4] A discussion of the reasons New Jersey adopted an elective statute in 1911 is recited in Naseef v. Cord, Inc., 48 N.J. 317, 322, n. 1, 225 A.2d 343 (1966), and abridged as follows, minus most citations:

The New Jersey Workmen's Compensation Act was passed in 1911, at a time when the constitutional validity of the compulsory compensation statutes was still very much in doubt. * * * Apprehension that the compulsory act was unconstitutional influenced the Legislature and encouraged it to adopt the alternative measure, the elective concept of compensation....
Subsequently, the Supreme Court of the United States upheld the compulsory compensation acts.... As a result, most large industrial states make coverage under workmen's compensation compulsory.... [New Jersey, South Carolina, and Texas are the only elective states where both employers and employees have the right to reject coverage. 2A Larson's Workmen's Compensation Law, § 67.10 (2000).]
The purpose of the compensation acts is to provide speedy, dependable financial assistance to the injured employee.
[5] "The Article I remedy imposes more burdens upon the employee." Licata v. Lutz, 48 N.J. 255, 258, 225 A.2d 127 (1966). An employee covered under Article I must "face the rigors of litigation in the law courts" and "allege and prove negligence on the part of his employer." Ibid. The employee is not guaranteed a recovery, even though his or her injury "arose by accident out of and in the course of his employment." Ibid.
[6] "Compensable occupational disease" is defined in N.J.S.A. 34:15-31, amended by L. 1979, c. 283 § 10, effective January 10, 1980, in the following terms:

N.J.S.A. 34:15-31
(a) For the purpose of this article, the phrase "compensable occupational disease" shall include all diseases arising out of and in the course of employment, which are due in a material degree to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or place of employment.
(b) Deterioration of a tissue, organ or part of the body in which the function of such tissue, organ or part of the body is diminished due to the natural aging process thereof is not compensable.
[7] Kibble held that an employee may not unilaterally waive the rights of his or her dependents to receive dependency benefits in the event that the employee's death occurs as a result of the injuries or conditions encompassed by the employee's compensation claim. Ledger argues in its brief that Kibble is inapplicable here because the Article I election notice was not a waiver of Peck's rights under the Act. However, signing the notice is argued to be a waiver of his right to recover for occupational diseases under Article II. Kibble establishes that a waiver of rights with respect to the Act should be made "knowingly, intelligently and voluntarily." 161 N.J. 178, 195, 735 A.2d 1142 (1999).
[8] This issue was not addressed in petitionerrespondent's brief.
[9] This endorsement does not appear to have been specifically argued in the proceedings below, but was apparently included in the policies submitted at the hearing.